# THE PECK STEAMSHIP LINE, Plff.,

*v.*

# THE NEW YORK & PORTO RICO STEAMSHIP COMPANY AND THE AMERICAN RAILROAD COMPANY OF PORTO RICO, Dfts.

San Juan, Law, No. 396.

1. By effect of the 9th article of the treaty of peace between the United States and Spain, and §§ 8 and 14 of the organic law of Porto Rico (31 Stat. at L. 77, chap. 191), all the general acts of Congress, whether applying to the "territories" or to the "territory" of the United States, are applicable in Porto Rico, when not locally inapplicable.

2. There is nothing in the antitrust law (26 Stat. at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3200, July 2, 1890), entitled "An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies," which makes it locally inapplicable to Porto Rico, although it was enacted before the cession of Porto Rico to the United States.

3. Porto Rico is substantially a territory of the United States.

4. A complaint which alleges an unlawful combination between two common carriers, one alleged to be engaged in trade between Porto Rico and a state of the Union, is sufficient as against both defendants.

5. Allegations to the effect that, by reason and effect of an unlawful combination in restraint of trade, plaintiff, a common carrier, lost the carriage of a large amount of trade, and that the customers of plaintiff would thereby be compelled to pay an increase in the handling of freight, and, for that reason, would not ship with plaintiff, are not allegations of damages too remote to be considered under the antitrust law.

6. Such a combination is not less unlawful because made by parties not actually in competition with each other.

7. The contract evidencing the alleged unlawful combination need not be set out in the complaint *in hæc verba.*

Peck Steamship Line v. New York & P. R. S. S. Co.

8. An alleged contract between a railroad in Porto Rico and a steamship line between Porto Rico and New York, intended to give the latter a monopoly of the landing facilities at the port of San Juan, Porto Rico, would, if proved as alleged, be in violation of the antitrust law.

9. An action brought under that law to recover damages sustained by reason of the unlawful combination is not an action based on the said contract.

10. Under the antitrust act only the government can file a bill to enjoin acts under a contract in violation thereof.

Opinion filed September 4, 1906.

Messrs. *Hord & Hawkins* and *J. Henri Brown, Esq.,* for plaintiff.

*Francis H. Dexter, Esq.,* and *Messrs. Hartzell & Rodriguez* for the New York & Porto Rico Steamship Company.

*Francis H. Dexter, Esq.,* for the American Railroad Company of Porto Rico.

Rodey, Judge, delivered the following opinion:

This cause is before the court on a demurrer to the declaration or complaint. It is a suit for damages in the sum of $180,000, brought under § 7 of the act of Congress of July 2, 1890 (26 Stat. at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3202), commonly known as the antitrust act, and entitled: "An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies."

The case was argued at length by counsel for all parties. The defendants filed a joint demurrer, but appeared by separate counsel, and all of the parties have filed elaborate briefs. Apart from the many other grounds of demurrer to the different paragraphs of the declaration, for insufficiency and other reasons, it

becomes necessary to pass upon the very important question as to whether the antitrust act, having been passed some ten years before the date of the approval of the treaty by which Spain ceded Porto Rico to the United States, applies to or is in force, in whole or in part, in Porto Rico.

It is found impossible, because of the character of the declaration and the demurrer, to pass upon the questions involved without setting them both out *in extenso*. The complaint consists of nineteen paragraphs, and, with the preamble, is as follows:

## Complaint.

The plaintiff, the Peck Steamship Line, a corporation duly organized and existing under and by virtue of the laws of the state of New York, and doing business in Porto Rico, with offices at San Juan, Porto Rico, complaining of the defendant, the New York & Porto Rico Steamship Company, a corporation duly organized and existing under and by virtue of the laws of the state of New Jersey, U. S. A., doing business in Porto Rico and with offices at San Juan, Porto Rico, and the American Railroad Company of Porto Rico, a corporation duly organized and existing under and by virtue of the laws of the state of New York, doing business in Porto Rico and having its main offices in the city of San Juan, Porto Rico, alleges:

1. That the plaintiff is now, and at the times of the doing of the acts herein complained of was engaged in the management and operation of a line of steamships between San Juan and other ports in Porto Rico and the city of New York, in the state of New York, for the purpose of doing and carrying on a general freight business between the city of New York and the various ports in Porto Rico.

2. That the defendant the New York & Porto Rico Steamship

Company has for several years past been engaged in operating a line of steamships between the same points, and is still continuing so to operate the same, doing a general freight and passenger business between the said points, owning and controlling a certain pier located in the harbor of San Juan, known as "Pier No. 1," and did own and control said pier at the times of the doing of the acts herein complained of.

3. That the defendant the American Railroad Company of Porto Rico is engaged in the operation of a railroad line in the island of Porto Rico, and, as assignee of the "Compañia de los Ferrocarriles de Puerto Rico," obtained the control and management of a certain dock in the harbor of San Juan known as the "Quartermaster's dock" under the terms of a certain franchise granted its assignor, the said "Compañia de los Ferrocarriles de Puerto Rico" by the executive council of Porto Rico on October 28th, 1901.

4. That the said franchise still continues in full force and effect and that the said defendant the American Railroad Company of Porto Rico, at the times of the doing of the acts herein complained of, professed to control and manage the said Quartermaster's dock by virtue of and according to the terms of the said franchise.

5. That the said franchise provides that the grantee or its assignee, the defendant the said American Railroad Company of Porto Rico, shall, by suitable rules and regulations, approved by the executive council, and subject to alteration or amendment by the executive council, permit the use of the said dock to all vessels.

6. That the said Pier No. 1 and the said Quartermaster's dock are the only points in the harbor of San Juan where steamships can dock to load and discharge cargo without the use of lighters.

7. That heretofore, to wit, on or about the month of December, 1905, and from that time down to this date, the steamships chartered by the plaintiff with large capacity for the carriage of freight, and being such as the plaintiff company had just reason and cause to believe could be operated between the said ports of Porto Rico and the said city of New York for the carriage of freight as aforesaid at a large profit to the plaintiff, have been making trips between the said ports and have been carrying out and performing their contracts and obligations entered into by and between plaintiff and the shippers of freight in the island of Porto Rico and the said city of New York and other points in the United States, but that owing to the illegal, wrongful, and malicious conduct of the defendants, and their agents and employees, both in the island of Porto Rico and the city and state of New York, plaintiff has been greatly hindered and obstructed in the discharge of its obligations as aforesaid contracted with the shippers of freight in the island of Porto Rico and points in the United States by reason of the said wrongful and illegal acts and doings on the part of the said defendants.

8. That on or about the month of December, 1905, the said defendants did wrongfully, maliciously, and wantonly combine, confederate, and conspire together to illegally harass, interfere with, obstruct, and cause damage to the plaintiff in the conduct of its business, for the purpose of ruining and destroying the said business of the plaintiff, and compelling the plaintiff to desist from the continuance of such business, and to the end that the defendants the New York & Porto Rico Steamship Company might have and enjoy a monopoly of the freight business between the said ports of New York and Porto Rico.

9. That said conspiracy and combination entered into by the defendants as aforesaid was in restraint of trade and commerce between the ports of Porto Rico and the said city of New York,

II. PORTO RICO.—8.

in the state of New York, and was an attempt to monopolize trade and commerce between the aforesaid ports, in contravention of the provisions of an act of Congress of July 2d, 1890, entitled: "An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies."

10. That the defendants, well knowing the intention of the plaintiff to engage in the freight business as aforesaid, and in anticipation of such action on the part of the plaintiff, contriving and unjustly and wrongfully intending to destroy free competition and to restrain trade and commerce between the aforesaid ports, and seeking to avoid the duties and responsibilities to the public imposed upon the grantee or its assignee by the conditions of the said franchise to use the said Qaurtermaster's dock, did conspire together by means of a certain contract and secret agreement dated December 29th, 1905, to illegally secure the control of the said Quartermaster's dock to the defendant the New York & Porto Rico Steamship Company, contrary to law and the terms of the said franchise; that the said action on the part of the said defendants was done and performed in the carrying out of the said unlawful and illegal purpose, and that by reason thereof the said defendant the New York & Porto Rico Steamship Company secured to itself a monopoly of the dock and wharf facilities in the harbor of San Juan.

11. Plaintiff further alleges that the ships of the defendant the said New York & Porto Rico Steamship Company could easily have been served from said Pier No. 1, belonging to the said defendant company, and that the said Quartermaster's dock was not and is not necessary for the discharge and loading of freight by the vessels of the said defendant company, but that the absolute control of the said Quartermaster's dock was so given to the said New York & Porto Rico Steamship Company solely in furtherance of the said unlawful purpose of destroying the busi-

ness of its only competitor, the plaintiff, and securing to the said defendant the New York & Porto Rico Steamship Company the said monopoly.

12. That in pursuance of the said unlawful purpose and design the said defendants, nor either of them, made any of the rules and regulations required by the terms of the said franchise or grant, but did on various occasions refuse to permit the ships of the plaintiff to approach said Quartermaster's dock to load and discharge cargo when said dock was unoccupied, and on other occasions did cause ships of the said New York & Porto Rico Steamship Company to lay at the said dock for the sole and only purpose of depriving plaintiff of its rights and privilege to load and unload its ships at such dock when not occupied by other ships having a bona fide right to be at such dock, and defendants did further refuse to obey the lawful orders of the duly constituted and legal authorities to remove such ships from said dock.

13. That by reason of the said wrongful and illegal acts the business of the plaintiff was greatly injured, so that instead of being a profitable one, which it would have been under equal conditions as to the loading and discharging of its ships, had not the defendants, as aforesaid, contrived to monopolize the shipping facilities of said harbor of San Juan for the benefit of the said New York & Porto Rico Steamship Company, it became a losing business, by reason of which the plaintiff has suffered great and grievous loss to the extent of many thousands of dollars.

14. That solely by reason of the said wrongful acts of the defendants the ships of the plaintiff, arriving in the harbor of San Juan, were compelled to anchor in the said bay and to lighter and discharge their freight from said places, using for that purpose lighters and lightermen and small boats, all of which ex-

pense would have been avoided had the steamers of the plaintiff been allowed to approach the said Quartermaster's dock and pier in the said harbor, as they had a right to do, and which were not then occupied by other steamers with a bona fide right thereto, and that, by reason of the necessity of employing said lighters and lightermen and small boats, plaintiff was put to a large additional expense amounting to the sum of five thousand dollars ($5,000).

15. That by reason of the fact that the ships of the plaintiff were so as aforesaid compelled to anchor and load and discharge in the harbor of San Juan, and were not allowed, as aforesaid, to approach the said dock and the said pier, it became and was necessary for the plaintiff, in the discharge of its business, to employ a large number of additional longshoremen, watchmen, and checkers for the proper handling and loading and unloading of the freight carried by said ships, over and above the expenses to which plaintiff would have been put had its ships been allowed as aforesaid to approach said dock and pier as they had a right to do so as aforesaid, and that the said additional expense so incurred as aforesaid amounts to the sum of four thousand dollars ($4,000).

16. That by reason of the said wrongful and illegal acts on the part of the defendants, their agents and employees, the ships of the plaintiff were detained in the port of San Juan for a much longer time than they would have been detained for the matter of loading and unloading their freight had they been allowed to approach the said pier and dock in manner and form as they had a right to do as aforesaid, and that by reason of the said delay or demurrage plaintiff has been put to a large additional expense which would otherwise, as aforesaid, been saved them, and that the same amounts to the sum of twelve thousand, five hundred dollars ($12,500).

17. That when these plaintiffs proposed to engage in the handling of freight between the ports of the island of Porto Rico and the said port of New York they had reason to believe, and did believe, that, under proper circumstances and with fair and reasonable treatment in the harbor of San Juan in the matter of the loading and unloading of its said ships, it would be able to run its said ships on schedule time and advertise fixed dates for the sailing of its said ships both from the island of Porto Rico and the port of New York; but that, owing solely and only to the great inconvenience and delay to which its said ships were so as aforesaid put by the defendants, said ships could not make said schedule, and that by reason thereof the plaintiff lost the carriage of a large amount of freight from the said city and port of New York to the ports of the island of Porto Rico, all of which loss is directly chargeable to the wrongful acts and doings of the defendants, their agents and employees, and that by reason of the said loss of freight from the port of New York to the island of Porto Rico plaintiff has been injured in the further sum of thirteen thousand, five hundred dollars ($13,500).

18. That, by reason of the said wrongful acts and doings on the part of the said defendants, making it impossible for the ships of the said plaintiff to approach the said pier and dock at the proper times and under the proper conditions, to load sugar and other freight for the said port of New York, and by reason of the large additional expense which would have been occasioned to the shippers of said sugar by reason of the inability of the ships of the plaintiff to get to said dock or pier, owing solely to the acts and doings of the defendants, the plaintiff has suffered great wrong and loss, and that the said loss amounts to the sum of twenty thousand dollars ($20,000).

19. Plaintiff charges that each and every loss so as aforesaid occasioned, and suffered by it, has been and is the direct result

of the said wrongful acts and doings on the part of the said defendants, which said defendants deliberately and with the sole intention of injuring the business of this plaintiff, and depriving it of its fair share of the freight business between the points aforesaid, and of ruining and destroying its business, did, as aforesaid, try, and become and hold a monopoly of the shipping facilities of the said San Juan harbor, and did thereby, as aforesaid, make it impossible for the plaintiff company to carry out and perform its obligations with the shippers of freight between said points, except at a great loss, as hereinbefore set out.

Wherefore, by reason of the premises, the plaintiff has been damaged in the sum of sixty thousand dollars ($60,000), and prays for judgment against the defendants in the sum of one hundred and eighty thousand dollars ($180,000), and the costs of this suit, including a reasonable attorneys' fee as in such cases by law and statute is provided.

San Juan, Porto Rico, June 25, 1906.

The demurrer sets out fourteen specific grounds, and is as follows:

## Demurrer.

First. Because this honorable court, in which said action is brought, is not a circuit court of the United States, and has not had conferred upon it by the Congress of the United States the special jurisdiction necessary in order to entertain an action for violation of the act of Congress referred to in, and made the basis of, said complaint.

Second. That the complaint does not state facts sufficient to constitute a cause of action against the defendants jointly.

Third. That the complaint does not state facts sufficient to constitute a cause of action against either of the defendants separately.

Fourth. That several causes of action have been improperly united in said complaint.

Fifth. That the alleged causes of action or claims for damage set forth in paragraphs 17 and 18 of said complaint are too indirect and remote, and do not set forth elements of damage for which defendants can, under any circumstances, be held responsible.

Sixth. That the complaint is ambiguous and uncertain, in that it is not distinctly alleged whether the defendant American Railroad Company is engaged in commerce between the United States and Porto Rico.

Seventh. That the complaint is further ambiguous and uncer-- tain in that it is not distinctly alleged whether the alleged combination and conspiracy between the defendants tended to restrict competition between them, or whether said defendants, before the alleged making of such combination and conspiracy, were, or could have been, competitors in the lines of business which they were respectively chartered to carry on or were actually engaged in.

Eighth. That the complaint is further ambiguous, unintelligible, and uncertain in that it refers to an alleged contract under date of December 29, 1905, but the said alleged contract or agreement is not set forth *in hæc verba*, but only the conclusions of the pleader are set forth in said complaint as to the unlawful or illegal character thereof, and this court cannot determine whether the same is illegal or not unless a copy of said alleged contract or agreement be set forth or the specific contents thereof be alleged.

Ninth. That the complaint is further ambiguous and uncertain in that, while it is alleged in paragraph 10 thereof that defendants conspired together to illegally secure the control of said Quartermaster's dock for defendant New York & Porto Rico

Steamship Company, it is nowhere in said complaint alleged, nor are any facts stated to prove, that such conspiracy was carried out or the control of said dock secured for said last-named defendant.

. Tenth. That the complaint is further ambiguous and uncertain in that it is not made clearly to appear that said alleged monopoly, even if it existed, would be in violation of the act of Congress of July 2d, 1890, upon which plaintiff bases its right to recover.

Eleventh. That all the allegations of the complaint are based upon a monopoly alleged to have been made and created by the defendants herein of the Quartermaster's dock, under the control of the defendant the American Railroad Company of Porto Rico, there being no law of the United States or of Porto Rico prohibiting any such alleged monopoly in Porto Rico.

Twelfth. That the complaint is further ambiguous and uncertain in that it is not made to appear wherein the defendants or either of them owe any duty to the plaintiff individually as distinguished from the public in general with regard to the docking facilities in the harbor of San Juan, or wherein said defendants have violated any duty owed by them as common carriers to the public in that regard.

Thirteenth. That the alleged damage set forth in said complaint and the items thereof are ambiguous, unintelligible, and uncertain, and are only conclusions of the pleader, and the same should be specifically set forth if any such damage has occurred as alleged.

Fourteenth. That the complaint contains an improper joinder of causes of action, to wit: In that by said complaint there is attempted to be alleged a cause of action based upon a contract, as well as a cause of action based upon a combination in form of a trust or otherwise, and a conspiracy being in the nature of a tort or wrongful act.

Wherefore the defendants pray the judgment of this honorable court whether they should further plead to said complaint, and that the same be dismissed with costs in favor of defendants.

The act of Congress referred to is entitled: "An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies" (26 Stat. at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3200), and is as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such territory and another, or between any such territory or territories and any state or states or the District of Columbia, or with foreign nations, or between the District of Columbia and any state or states

or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 4. The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

"Sec. 5. Whenever it shall appear to the court before which any proceeding under section four of this act may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpœnas to that end may be served in any district by the marshal thereof.

"Sec. 6. Any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in section one of this act, and being in the course of transportation from one state to another, or to a foreign country, shall be forfeited to the United States, and may

be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law.

"Sec. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee.

"Sec. 8. That the word 'person,' or 'persons,' wherever used in this act, shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the territories, the laws of any state, or the laws of any foreign country."

The 9th article of the treaty of Paris, of April 11, 1899, by which Porto Rico was ceded to the United States, provides: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." [30 Stat. at L. 1759.]

On April 12, 1900, Congress passed an act (31 Stat. at L. 77, chap. 191), commonly known as the Foraker act, by which it provided a unique and quite complete system of government for the island of Porto Rico and its appurtenant islands. This act, while to a large extent modeled upon the organic acts of the older territories, is in some respects radically different, in that the President appoints the upper house of the legislature, and that several of the members of the said upper house also are the heads of the several departments. The act is unique in other respects, a noticeable one being that it turns over to the people of the island all the customs and other revenues, etc. Sec. 7,

after describing the classes of people intended to be included, provides that "they, together with such citizens of the United States as may reside in Porto Rico, shall constitute a body politic under the name of 'The People of Porto Rico,' with governmental powers as hereinafter conferred and with power to sue and be sued as such."

It may be as well to notice at this point that Congress studiously avoided calling the new jurisdiction, "the territory of Porto Rico." It will be seen by an examination of the Revised Statutes, §§ 1896 to 1904, inclusive, that Congress made no such omission in the naming of New Mexico, Utah, Washington, Dakota, Arizona, Idaho, Wyoming, or as to Oklahoma, May 2, 1890 (26 Stat. at L. 81, chap. 182), or as to Hawaii (31 Stat. at L. 141, chap. 339); and, in fact, it will be found that at no time heretofore in the organization of territories has such an omission been made. It might also be well to notice here that the several organic acts of the territories heretofore organized provided that they were to be "erected into a temporary government by the name of 'the territory of,' " etc., so that no importance need be given to the fact that the Foraker act, above mentioned, states that it is: "An act temporarily to provide revenues," etc.

Sec. 8 of this Foraker act provides: "That the laws and ordinances of Porto Rico, now in force, shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States, not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico, or by act of Congress of the United States."

Peck Steamship Line v. New York & P. R. S. S. Co.

Sec. 9 provides for the nationalization of all vessels owned by the inhabitants of Porto Rico; and it is provided in § 14: "That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Porto Rico as in the United States, except the internal revenue laws," etc.

Sec. 16 provides that the judicial process shall run in the name of the United States, etc., and that criminal prosecutions shall be conducted in the name, and by authority, of "The People of Porto Rico," and that all officials shall take an oath to support the Constitution of the United States and the laws of Porto Rico.

In addition to the paragraphs of law above quoted, providing that the statutory laws of the United States, not locally inapplicable, should have force and effect in Porto Rico, § 1891 of the Revised Statutes provides that: "The Constitution and all laws of the United States which are not locally inapplicable, shall have the same force and effect within all the organized territories, and in every territory hereafter organized, as elsewhere within the United States."

It is, of course, questionable whether this latter section, notwithstanding its terms, can be said to apply to Porto Rico, certainly that part of it that refers to the Constitution, because this whole Foraker act, even while there is no repealing clause in it, is special in its nature, and studiously avoids extending, in terms, the Constitution of the United States to the island. But it would seem that a man as eminent as former Attorney General, now Senator, Knox, thought that this section applied to Porto Rico in an opinion in a matter referring to the registration of trademarks (23 Ops. Atty. Gen. 634), wherein he stated: "In so far as residents of Porto Rico are concerned, laws of Congress 'not locally inapplicable' have, by the act for the govern-

ment of that island and by Revised Statutes, § 1891, been extended to it."

It is a reasonable conception that when Congress, under its constitutional powers, enacts a general law seeking to remedy some widespread evil in the nation, and which evil exists in the territories equally with the states, if there is any language in the act itself denouncing the evil, that makes it applicable to the territories, fine distinctions as to the meaning of the word "territories" ought not to prevent the enforcement of the law in places where Congress has even ampler powers than it has in the states. Such acts being remedial in their nature, it was held, in Southern P. R. Co. v. United States, 38 Fed. 55, and the rule is well established, that they should be liberally construed. And we think this is true to a reasonable extent, even when the new law denounces that as a crime which was not a crime before, especially when the proceeding under the act is a civil suit for damages.

The antitrust, antimonopoly and antirebate law, the Elkins law, the pure food law, the employer's liability act, and similar laws of Congress, are necessary and salutary enactments, intended to cure widespread, intolerable evils. Some of them were not enacted soon enough, and others of them were not enforced soon enough with sufficient vigor. In fact, it is current judicial and political history, that their enforcement and enactment have taken more time than any other one subject in recent times. It would seem, therefore, that wherever such laws are not locally inapplicable, they ought to be enforced without interfering with proper and legitimate commercial transactions, or the rights of individuals or capital. The spirit from which violations of them emanates ought, if possible, to be discouraged at its inception, in all jurisdictions where the law is in force.

While it is not necessary to express a positive opinion upon

the subject yet, in all probability the new rate bill enacted by Congress on June 29, 1906, and the other new laws above referred to, over which the Senate of the United States spent so much time, apply to Porto Rico. Like the antitrust act, they are intended to remedy widespread evils. The rate bill shows the intent of Congress, wherever it has complete power, as it certainly has with reference to a place like Porto Rico, to legislate drastically against contracts, combinations, conspiracies, and monopolies in restraint of trade, because in § 1, when fixing the sort of transportation of commodities it shall apply to, after mentioning the states and the District of Columbia, it sets out that it shall apply to transportation from one place in a territory to another place in the same territory. There are, no doubt, many other general laws that are in force in Porto Rico, that we do not at the moment call to mind.

Much stress against the applicability of the act in question, to Porto Rico, is laid by counsel for defendants upon the question as to whether or not Porto Rico is what is now becoming known in certain acts of Congress as an "organized territory." Several acts of Congress, noticeably the new naturalization law of June 29, 1906, speak of "organized territories," in an apparent effort to make some distinction between the Philippines and Porto Rico on the one hand, and the other territories and the states on the other hand, or the Philippines alone and the other territories and states, including Porto Rico. Many acts of Congress, when denouncing certain acts and doings as crimes, refer to the states and territories and to the District of Columbia. Alaska has always been known as the "District of Alaska," and Congress has several times refused, in acts referring to it, to call it a territory. On the other hand, the Indian territory, which was, and is, in no sense an organized territory, as contemplated in this contention of counsel, has always been referred to

in acts of Congress and by the people as, "the Indian territory;" it therefore appears that the word "territory" is often loosely used. As recent as this last session of Congress, in the appropriation bill for the government of the territories (59th Congress, 1st Session, pp. 416, 417), Alaska is called a district and Porto Rico is called a territory; while on p. 295, Session Laws, same Congress, in an appropriation for shipwrecked seamen, Alaska is called a territory. And again, on p. 169, in the bill providing for the election of a delegate to the House of Representatives, the act opens by using the language: "That the people of the territory of Alaska shall be represented by a delegate," etc.

It is perhaps because of the unique status of the people of Porto Rico in being received from Spain by the same treaty as the Philippines and being created into a body politic and denied citizenship of the United States, while owing permanent allegiance to the nation, that this apparent difficulty about the application of laws to it arises. The writer of this opinion knows from his experience in an effort to bring the southwest territories into the Union as states, that, whether it is well founded or not, Congress is possessed of a fear that the word "territory" has something in it that imports a promise of statehood to the section of country so characterized; but history does not support this fear, because California became a state in 1850 without ever having been a territory, and the Indian territory has just been blessed with an enabling act, without ever having been "organized." "A rose by another name would smell as sweet." And therefore, if Porto Rico can be said to be a territory, even with a small "t," all general acts of Congress applying to territories, when not locally inapplicable, should, in our opinion, under the Foraker act, be held to be in force here. It is difficult to see what is locally inapplicable about that portion

of the antitrust act applicable to territories. In Huus v. New York & P. R. S. S. Co. 182 U. S. 392, 45 L. ed. 1146, 21 Sup. Ct. Rep. 827, it was held that not only did the Foraker act nationalize all Porto-Rican vessels, but placed Porto Rico substantially upon the coast of the United States, and that vessels engaged in trade between that island and the continent are engaged in the coast trade. In Gonzalez v. Williams, 192 U. S. 1, 48 L. ed. 317, 24 Sup. Ct. Rep. 177, it was held that Porto Ricans are not alien immigrants within the immigration law of March 3, 1891 (26 Stat. at L. 1084, chap. 551, U. S. Comp. Stat. 1901, p. 1294).

The rulings of the Supreme Court of the United States in what have become known as the "Insular Cases" are now so well known and have so little application to the question at issue that it is not considered expedient to cite them. So it appears from every authority that can be cited, that Porto Rico is substantially a territory of the United States, over which all of the general laws of Congress properly applicable to territories, and not in terms locally inapplicable, are in full force and effect.

To our mind, for the purposes of this particular decision, it is not important whether, as a matter of fact or law, Porto Rico is entirely within the definition of an "organized territory." Whether it is sufficiently a territory to come within the terms of § 3 of the antitrust act aforesaid, which denounces certain acts "in restraint of trade or commerce in any territory of the United States," etc., is what is to be decided here.

Attorney General Knox, in his opinion regarding trademarks, 23 Ops. Atty. Gen. 635, stated: "Porto Rico has been fully organized under a law of Congress providing the details of its government, and organized, for the most part, upon the plan adopted for the territories contiguous to the states of the Union. The presumption from the whole tenor of this organic act is

II. Porto Rico.—9.

that a liberal construction of the provision extending the laws of the United States would comport with the design of Congress."

Further on in the same opinion he states: "In addition to this, the trademark act undoubtedly applied to the United States in the sense of the states, the organized territories, and the District of Columbia, and not in the sense of the states united. The law was therefore broad originally and intended to apply to territories as well as states. To these organized territories, Porto Rico, similarly and completely organized, has now been added."

Attorney General Griggs, on June 2, 1900, held. (23 Ops. Atty. Gen. p. 169) that by virtue of § 14 of the Foraker act, the laws of the United States relative to the organization and powers of national banks were extended to Porto Rico.

The same Attorney General, on p. 400 of the same volume, with reference to American seamen, held that: Under §§ 9 and 14 of the Foraker act, "a Porto Rican engaged in the occupation of a seaman in the American merchant marine . . . is an American seaman within the meaning of the statutes relating to relief by consuls."

Hoyt, Acting Attorney General, on July 15, 1902 (24 Ops. Atty. Gen. p. 86), held that the Foraker act gives force and effect in Porto Rico to the immigration act of Congress of 1882. This latter is a law that was enacted eighteen years previous to the Foraker act.

It is held by the Supreme Court of the United States, in the case of J. Ribas y Hijo v. United States, 194 U. S. 315, 48 L. ed. 994, 24 Sup. Ct. Rep. 727, that: "An action which could be brought under the Tucker act [24 Stat. at L. 505, chap. 359, U. S. Comp. Stat. 1901, p. 752], against the United States, in either a district or a circuit court of the United States, is within the cognizance of the district court of the

United States of Porto Rico." The Tucker act is a long one, with some fifteen sections in it, and nowhere refers to a territory, yet, under the provisions of the Foraker act, making all laws of the United States not locally inapplicable, the law in Porto Rico, and giving this court the jurisdiction of a circuit and district court of the United States (§ 34, Foraker act), the Supreme Court held that it was in force here.

It would appear that Porto Rico is in fact more of an organized territory than some of the older jurisdictions, because it has what no other territory, save Hawaii, has; that is, a separate court of the United States, presumably to enforce United States laws as a part of its jurisdiction, wholly distinct from the local insular courts, which form a complete and ample local system in themselves.

An instructive case in this regard was tried in the circuit court of appeals for the 8th circuit, May 21, 1894. It is entitled, Ardmore Coal Co. v. Bevil, 10 C. C. A. 41, 27 U. S. App. 96, 61 Fed. 757. It was provided by an act of Congress of May 2, 1890 [26 Stat. at L. 94, chap. 182, § 31], that certain laws of Arkansas, as published in Mansfield's Digest, "which are not locally inapplicable or in conflict with this act, or with any law of Congress relating to the subjects specially mentioned in this section," should be extended over the Indian territory; and it then proceeded to enumerate the titles in Mansfield's Digest which should be thus enforced. One of the titles was "Pleadings and Practice," but in the Digest under that same heading was a section allowing recovery of damages for death by negligence, and it was contended that this law was not extended over the Indian territory. The court in that case states: "It is apparent, we think, that Congress intended to extend over the Indian territory all of the provisions that are found in the several chapters of Mansfield's Digest, which are enumerated in § 31 of the act

of May 2, 1890, unless they were locally inapplicable, or were in conflict with the act of May 2, 1890, or with some other existing act of Congress." The case is too long to quote at length, but it is unique for pith and force, and for the way it condemns a prevalent custom of reading doubts into statutes where none in fact exist or should exist.

In the case at bar, we fail to see how the antitrust act is locally inapplicable in itself. On the contrary, it is locally very applicable and a salutary provision of law that the island badly needs if it is not in force already. We therefore hold that the act of Congress in question, for the purposes of this suit, at least, is not locally inapplicable, under the complaint, and is, or at least that portion of it referring to territories, in full force in Porto Rico. This disposes of the first and main ground of demurrer.

The second and third grounds of demurrer are simply general allegations, and need not be passed upon if the bill states a cause of action.

The fourth ground of demurrer is that several causes of action have been improperly united in the complaint. We do not think this is the fact, and our argument hereafter will show why the court is of that opinion.

The fifth ground of demurrer, that the causes of action set out in ¶¶ 17 and 18 in the complaint or declaration are too indirect and remote, and do not set forth elements of damage for which defendants can, under any circumstances, be held responsible, is answered for the present as we have answered the last preceding ground of demurrer; and further, if a bill of particulars or the proofs shall show that the damages claimed are too indirect and remote, an objection at the right time at the trial will be available.

As to the sixth ground of demurrer, that the complaint is am-

biguous and uncertain, in that it does not distinctly allege whether the defendant the American Railroad Company is engaged in commerce between the United States and Porto Rico, we think that, under the holding as to the first ground of demurrer herein, this would be immaterial, and it is therefore overruled.

As to the seventh ground of demurrer, that it is not alleged that the combination and conspiracy between defendants tends to restrict competition, or that the defendants were theretofore competitors, we do not think this was necessary or that the complaint is subject to it.

The eighth ground of demurrer, that the contract referred to is not set out in the complaint, has, in our opinion, no merit, because if it is in the possession of the defendants, they can plead it and set it out in full; and, if no such contract was ever made, they can deny its existence. It is not sued on in the case.

The defendants are mistaken in their ninth ground of demurrer, that it is not anywhere stated in the complaint that the conspiracy with reference to the dock secured was carried out. It is substantially alleged in ¶¶ 10, 13, and, by implication, in ¶19 of the declaration.

As to the tenth ground of demurrer, that it is not alleged that, even if a monopoly existed, it would be in violation of the anti-trust act, we do not think this ground of demurrer well taken. The whole tenor of the complaint is to the contrary.

The eleventh ground of demurrer is bad, under the holding of the court as to the first ground of demurrer.

The twelfth ground of demurrer is bad, because, if the facts set out in the declaration are true and can be proved, it follows that defendants are guilty of the violation of a duty which they owed to this plaintiff, as well as to the general public.

The thirteenth ground of demurrer is not well taken, because

if. the complaint is ambiguous or unintelligible to the extent claimed, there is a complete remedy by means of calling for a bill of particulars, as will be hereinafter pointed out.

The fourteenth ground of demurrer, in the opinion of the court, misconceives the basis of the complaint. As we look at it, it is not upon the alleged contract between the defendants that the suit is founded, because that contract, if of the character alleged, is void in law, and is only an inducement or a part of the whole conspiracy charged in the declaration. It is only the government itself that can, under this antitrust act, file a bill to enjoin acts under such a contract, or to decree its nullity. A private plaintiff can only refer to its existence as part of the proof of the injury.

. . Because of what we may be pardoned for characterizing as a rather prolix and not extremely specific declaration, and what may be called a carefully abundant number of grounds of demurrer to the same, the court has been prevented from condensing its views as it would like to do in this opinion.

. If counsel had exhibited the same care in the preparation of the complaint and the demurrer that they have in their search for the law and the preparation of their unusually able briefs and arguments, our task might have been easier. It is not without misgivings that the court, after carefully examining the law applicable to this great subject under these peculiar conditions, has arrived at the conclusions here announced. It may be said, however, in palliation of this feeling, that this court does not appear to be alone in that regard, judging from the involved condition exhibited by the opinions of different district and circuit courts, and even the opinions of some of the judges of the Supreme Court of the United States.

The whole gist of this case or cause of action is that the two defendants conspired together to effect a monopoly in one or

both of them, of the shipping business in San Juan harbor, and the carrying of freight in steamers to New York, and that, in furtherance of this, as it is alleged, they entered into a contract between themselves to prevent the plaintiff, who was, and is, a competitor with one of them in carrying freight between Porto Rico and New York in steamships, from having any dock facilities at San Juan; and that, although the defendant the New York & Porto Rico Steamship Company is possessed of a dock that, as alleged, is ample for its own purposes, it and the other defendant, in furtherance of this alleged conspiracy, contrary to law, shut out the plaintiff from the partial use of the only other dock in the harbor, known as the "Quartermaster's dock," on which the railroad company defendant had a lease, received through its predecessor in interest from the executive council. The executive council being the upper house of the legislative assembly of Porto Rico, and the conditions of the lease, it is alleged, obliging the said railroad defendant to permit other lines to have access to the dock in question; thus making it to an extent, if not absolutely, a public dock, and not a private one, as was the case in Louisville & N. R. Co. v. West Coast Naval Stores Co. 198 U. S. 483, 49 L. ed. 1135, 25 Sup. Ct. Rep. 745, which case is cited by defendants with great confidence. But that the defendants, in furtherance of this conspiracy, refused, under the alleged terms of their own agreement, to permit the plaintiff to so use the said "Quartermaster's dock," and refused to make regulations of tariffs which would be charged for the use of the same, as is required by the lease and by law; in fact, violated the law in that regard. The court is unable to see, if these things are true, and this antitrust act is in force in Porto Rico, why these acts are not a violation of the act, and a gross conspiracy in restraint of trade. The alleged contract between the defendants, and the fact that the carrying out of the

contract between them tends to create a monopoly, is, in our opinion, only a result; and alleging it in the declaration is only inducement leading up to the allegation of the consummation of the conspiracy that injures the plaintiff.

It must be remembered that this is a civil suit for damages under § 7 of the antitrust act, supra, and therefore, while reasonable strictness as to the allegations in the declaration should be required, the court is of opinion that no such technical strictness is called for as if it were an indictment on behalf of the government, charging the defendants with a violation of the act, or if it were a bill to restrain the acts of the defendants or to cancel this alleged contract. It is our opinion that, if the plaintiff should recover in this case, the evidence of that fact would not be permitted to be introduced in evidence in a criminal prosecution by the government thereafter.

In spite of its lack of specific allegations, the court is of opinion that the complaint on the whole sufficiently charges and alleges a right of action; and if the defendants need more information to prepare their defense, it is well settled since the great case of Tilton v. Beecher, 59 N. Y. 176, 17 Am. Rep. 337, which is the leading case on the subject, that they can call for, and force the plaintiff to give them, as specific a bill of particulars of its causes of action and damage, item by item, as they could were the suit one on the full common counts in a plain suit in assumpsit. In cases like this, a square, blunt demurrer, a traverse and avoidance, or a plain, positive denial of the facts, comports best with proper conduct in a defendant.

The court is unable to see how the allegations in this complaint that the conspiracy of the defendants tended to a monopoly can be other than an allegation of inducement, because, if the defendants had entered into any sort of contracts or agreements not in violation of this act,—and there are, no

doubt, many of them that could be so entered into, even though such contracts tended to a monopoly and tended to the injury of this plaintiff,—it would probably have no cause of action in a territory. The plaintiff cannot recover unless it shows damage to itself by acts that in themselves are a violation of law. It is possible that persons could enter into contracts, or a state of circumstances could exist, that would create a practical monopoly in favor of the parties engaged in it, against which no private person would have a right of complaint, but which the government itself might indict for, or restrain under the provisions of this antitrust act.

It is our opinion that the alleged conspiracy of these defendants, and their acts in that behalf, if proved, even though tending to a monopoly, and even though brought about by this alleged contract between themselves, is the real basis of the right of the plaintiff; and the injury to the plaintiff is the measure of the damages. The contract is only a part of the conspiracy. The monopoly is only a result of it. The conspiracy is the basis of the action, and the injury and violation of law the gist of the plaintiff's right.

Counsel for the defendant railroad company have presented a brief of unusual force, and sustained by citations of such unquestioned weight, that it has not been an easy matter for the court to follow its own reasoning to its logical end, or to avoid the intricacies to which the able argument led. The citation of even a dissenting opinion of a great judge in a great court, such as that of Mr. Justice Holmes in Northern Securities Co. v. United States, 193 U. S. 400, 48 L. ed. 726, 24 Sup. Ct. Rep. 436, cited by counsel, is not an argument to be passed over lightly, but we feel that the declaration in this case is not subject to its force. If it is to any extent subject to it, the defendants can preserve their rights by calling for a bill of particulars, as sug-

gested. Great stress is laid upon the fact that this declaration charges two separate and distinct offenses,—that is, contracts in restraint of trade, and combinations or conspiracies in restraint of trade. As stated, we are of opinion that the declaration in this case charges nothing but the conspiracy, to which all the other things lead up as inducements, the injury resulting from the conspiracy, and the violation of law, being the basis for the cause of action. From a careful reading of the declaration, we are inclined to think that it states a cause of action, even at common law, independent of any statute which a court of equity might grant relief for.

Several of the grounds of the demurrer allege omissions in the declaration, which, to the mind of the court, is matter of defense, and can be fully taken advantage of in that way. A plaintiff in this sort of an action ought not to be required to set out his entire proofs. The result would be an increased prolixity in the declaration, which properly belongs to a bill of particulars and the proofs. Justice is what every court aims at. If the plaintiff fails to make proper proofs, it cannot recover to the extent that it fails. If the defendants are guilty, as set out in the declaration, and the plaintiff has been injured thereby, the law gives him a right of action.

The demurrer will therefore be overruled in all of its parts.